FILED'08 OCT 29 14:44usdc-orp

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LONNIE HENSON,
          Plaintiff,

                                  CV 07-6213-PK

                                  FINDINGS AND
v.                               RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,
          Defendant.
_____

PAPAK, Magistrate Judge:

       Plaintiff Lonnie Henson filed this action August 21, 2007, seeking judicial review of a

final decision of the Commissioner of Social Security denying his application for supplemental

security income ("SSI") under Title XVI of the Social Security Act (the "Act"). This court has

jurisdiction over Henson's action pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

       Henson argues that the Commissioner erred in finding that his impairments did not meet

or equal one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, in failing to

Page 1 - FINDINGS AND RECOMMENDATION

develop the record fully as to the extent of his impairments, and in concluding that he was

capable of performing jobs existing in significant numbers in the national economy. I have

considered all of the parties' briefs and all of the evidence in the administrative record. For the

reasons set forth below, the Commissioner's decision should be affirmed.

### DISABILITY ANALYSIS FRAMEWORK

To establish disability within the meaning of the Social Security Act, a claimant must

demonstrate an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected . . . to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner has

established a five-step sequential process for determining whether a claimant has made the

requisite demonstration. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *see also* 20 C.F.R. §

416.920(a)(4). At the first four steps of the process, the burden of proof is on the claimant; only

at the fifth and final step does the burden of proof shift to the Commissioner. *See Tackett v.*

*Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the Administrative Law Judge considers the claimant's work activity, if

any. *See Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. § 416.920(a)(4)(i). If the ALJ finds that the

claimant is engaged in substantial gainful activity, the claimant will be found not disabled. *See*

*Bowen*, 482 U.S. at 140; *see also* 20 C.F.R. §§ 416.920(a)(4)(i), 416.920(b). Otherwise, the

evaluation will proceed to the second step.

At the second step, the ALJ considers the medical severity of the claimant's impairments.

*See Bowen*, 482 U.S. at 140-141; *see also* 20 C.F.R. § 416.920(a)(4)(ii). An impairment is

"severe" if it significantly limits the claimant's ability to perform basic work activities and is

expected to persist for a period of twelve months or longer. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 416.920(c). The ability to perform basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 416.921(b); *see also Bowen*, 482 U.S. at 141. If the ALJ finds that the claimant's impairments are not severe or do not meet the duration requirement, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c).

If the claimant's impairments are severe, the evaluation will proceed to the third step, at which the ALJ determines whether the claimant's impairments meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d). If the claimant's impairments are equivalent to one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, the claimant will conclusively be found disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iii), 416.920(d).

If the claimant's impairments are not equivalent to one of the enumerated impairments, the ALJ is required to assess the claimant's residual functional capacity ("RFC"), based on all the relevant medical and other evidence in the claimant's case record. *See* 20 C.F.R. § 416.920(e). The RFC is an estimate of the claimant's capacity to perform sustained, work-related, physical and mental activities on a regular and continuing basis,[1] despite the limitations imposed by the claimant's impairments. *See* 20 C.F.R. § 416.945(a); *see also* S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

---

[1] "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." S.S.R. No. 96-8p, 1996 SSR LEXIS 5.

Page 3 - FINDINGS AND RECOMMENDATION

At the fourth step of the evaluation process, the ALJ considers the RFC in relation to the claimant's past relevant work. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 416.920(a)(4)(iv). If, in light of the claimant's RFC, the ALJ determines that the claimant can still perform his or her past relevant work, the claimant will be found not disabled. *See Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f). In the event the claimant is no longer capable of performing his or her past relevant work, the evaluation will proceed to the fifth and final step, at which the burden of proof is, for the first time, on the Commissioner.

At the fifth step of the evaluation process, some individuals limited by physical impairments to sedentary or light work must be found disabled, depending on their age and vocational education level. 20 C.F.R. § 404, Subpt. P, App. 2. The so-called "grids" contained in Tables 1 and 2 of Appendix 2 to Subpart P of Section 404 set forth the criteria for determining whether such a nondiscretionary finding must be made. In the event the grids do not mandate a finding of "disabled," the ALJ considers the RFC in relation to the claimant's age, education, and work experience to determine whether the claimant can perform any jobs that exist in significant numbers in the national economy. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. If the Commissioner meets his burden to demonstrate that the claimant is capable of performing jobs existing in significant numbers in the national economy, the claimant is conclusively found not to be disabled. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g), 416.960(c), 416.966. A claimant will be found entitled to benefits if the Commissioner fails to meet his burden at the fifth step. *See Bowen*, 482 U.S. at 142; *see also* 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g).

## LEGAL STANDARD

A reviewing court must affirm an Administrative Law Judge's decision if the ALJ applied

proper legal standards and his or her findings are supported by substantial evidence in the record.

*See* 42 U.S.C. § 405(g); *see also Batson v. Comm'r for Soc. Sec. Admin.*, 359 F.3d 1190, 1193

(9th Cir. 2004). "'Substantial evidence' means more than a mere scintilla, but less than a

preponderance; it is such relevant evidence as a reasonable person might accept as adequate to

support a conclusion." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007), *citing*

*Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).

The court must review the record as a whole, "weighing both the evidence that supports

and the evidence that detracts from the Commissioner's conclusion." *Id.*, *citing Reddick v.*

*Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The court may not substitute its judgment for that of

the Commissioner. *See id.*, *citing Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir.

2006); *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). If the ALJ's

interpretation of the evidence is rational, it is immaterial that the evidence may be "susceptible

[of] more than one rational interpretation." *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir.

1989), *citing Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984).

## BACKGROUND

Henson was born March 18, 1971. Tr. 60, 207.[2] He earned a high school diploma, but

has not completed any further educational program or vocational training. Tr. 75, 208. Henson's

work history is summarized as follows: in 1988, he worked briefly for a KFC and briefly for

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the
administrative record filed herein as Docket No. 12.

Jean and Robbies' Harbor House in North Bend; from January to July 1990 he worked as a stocker at a Sears Roebuck and Co. store; later in 1990 he worked briefly for a KFC in Coos Bay; in 1991 he worked briefly for Premium Pacific Seafoods in Port Orford; in 1993 he worked briefly for a temp agency in Medford; from July 1998 to March 1999 he worked as a Salvation Army truck driver in Portland; later in 1999 he worked briefly for Supreme Floor Maintenance, Inc.; from April to June 2002 he worked as a stable hand for his grandparents in Coos Bay; and from July 2002 to April 2003 he worked as a shop helper at a Fine Home Resources store in Coos Bay. Tr. 54-57, 70-71, 77-83, 115-116, 127.

On March 4, 2005, Henson filed an application for Title XVI Social Security insurance benefits, alleging a disability onset date of March 1, 1980. Tr. 59-62. On or around the alleged onset date, when Henson was not quite nine years old, he fell from the back of a pick-up truck and was dragged for some distance under a horse trailer, suffering devastating injury. Tr. 16-17, 129, 133-134. The incident left him without a right ear or right ear canal, and seriously injured his legs and right shoulder. Tr. 16-17, 129, 133-134. He was unconscious for two days, and remained hospitalized for over a month, returning home at that time only because his mother was a registered nurse and was capable of providing him with adequate care at home. Tr. 16-17, 129, 133-134. During his extended hospital stay he underwent numerous reconstructive surgeries, and over the next ten years underwent nearly fifty additional short-stay procedures. Tr. 16-17, 129, 133-134. A metal plate was inserted into his head at age 11 or 12, he underwent numerous skin grafts, and muscles were transplanted from his right shoulder to his neck and scalp, leaving his right shoulder chronically weak. Tr. 16-17, 129, 133-134. His multiple facial scars and missing ear, the various prosthetic devices he was required to wear through much of his subsequent

Page 6 - FINDINGS AND RECOMMENDATION

childhood, and the intolerance and mockery of his schoolmates left him terribly self-conscious and socially alienated. Tr. 129, 133-134. According to his self-report, he has been depressed essentially continuously since the incident occurred. Tr. 129, 133-134, 138.

Henson describes his allegedly disabling medical conditions as post-traumatic stress disorder, weakness in his right arm, a chronic burning sensation in his stomach, and loss of hearing in his right ear. Tr. 69. He asserts that these conditions limit his ability to work because he cannot lift more than 20 pounds with his right arm, he has trouble following verbal instructions, and the presence of other people causes him extreme anxiety, including panic attacks, and increased stomach pain. Tr. 68-76, 84-86, 87-94.

The earliest medical report appearing in the administrative record is a consultative disability examination performed by Raymond P. Nolan, M.D., Ph.D., P.C., on April 16, 2005. Tr. 129-131. Dr. Nolan noted that Henson was subject to symptoms of "chronic fatigue [and] [s]ignificant insomnia," that he lacked a right ear and the ability to hear on the right side, that he had an "ongoing problem with frequent heartburn," "episodic wheeze with shortness of breath, particularly with exertion," and "episodes of chest pain recurring with walking too far." Tr. 129-130. He further assessed Henson with "[p]ost-traumatic stress disorder with depression, panic attacks, and agor[a]phobia," a "[p]rior history [of] intravenous street drug abuse," a "[h]istory [of] unexplained biliary ductal stricture," "[p]robable post cholecystectomy syndrome," "[c]hronic right rotator cuff tendinitis," and "[g]astroesophageal reflux disease with probable pulmonary manifestations." Tr. 131. Dr. Nolan ultimately opined that:

> This man's only physical limitation relates to an expected difficulty with repetitive use of his right arm over head . . . . However, it would appear that the major limiting factor in terms of employability at this time relates to the level of psychological dysfunction this man is experiencing. This has the potential to be a

Page 7 - FINDINGS AND RECOMMENDATION

major impediment to employability and successful employment performance. It is somewhat encouraging that he perceived that he was doing better while on [P]axil so this whole process might well be managed reasonably successfully pharmacologically.

Tr. 131.

Subsequently, on May 4, 2005, Henson underwent a consultative comprehensive

psychological examination performed by James M. Wahl, Ph.D. Tr. 132-143. Following a

battery of tests, Dr. Wahl diagnosed Henson with severe major depressive disorder, amphetamine

dependence in full remission as of approximately September 2004, and antisocial personality

traits. Tr. 137. Dr. Wahl assigned Henson a Global Assessment of Functioning score of 51, Tr.

137, and found his IQ to be within the average range at the 37th percentile, Tr. 136. Dr. Wahl

opined that:

> despite his 20 years of meth use his cognition remains intact in almost all respects.
> . . . He retains the cognitive ability to understand, remember, and carry out at
> least short and simple instructions, if not moderately complex ones, and he has
> adequate concentration and pace.
>
> * * *
>
> His biggest difficulties, of course, are in the area of social functioning and (to just
> a slightly lesser extent) [activities of daily living]. His disfigurement at age 8
> couldn't have come at a worse time, as like all pre-teens he was in the process of
> forming his self-image and was thus exquisitely attuned to the reactions of others.
> He tried to mask his resulting depression with years of drug use, but this only
> solidified his negative image. His depression has been severe enough to cause not
> only alienation from others but from himself as well, to the extent that he often
> doesn't care about such survival tasks as eating or grooming.
>
> In a work environment he could be expected to have a great deal of trouble
> dealing with others. . . . He would do best with tasks he was able to accomplish
> on his own. . . .
>
> He has no medical coverage now and thus isn't in treatment and takes no
> medications for his depression. He could certainly benefit from medication and
> treatment, but his problems are so deeply ingrained that no significant

improvement would be expected within 12 months.

Tr. 137-138. Dr. Wahl rated the severity of Henson's impairments in the areas of social functioning and activities of daily living as between "moderate" and "marked." Tr. 142.

On May 12, 2005, consulting psychiatrist Bill Hennings, Ph.D., compiled an assessment of Henson's mental residual functional capacity. Tr. 144-157, 159-162. Dr. Hennings noted that Henson suffered from moderate limitations in his ability to carry out detailed instructions, to work in coordination with or proximity to others, to get along with co-workers and maintain socially appropriate behavior, and to set realistic goals or make plans independently, and a marked limitation in his ability to interact appropriately with the general public. Tr. 159-160. Nevertheless, Dr. Hennings concluded that the medical records available to him contained "[n]o evidence of significant limitation in function." Tr. 161. Dr. Hennings opined that Henson's depression "limit[ed] [his] ability to consistently complete detailed or complex tasks," but not his "ability to complete simple, routine tasks," that his depression and antisocial personality traits "limit[ed] [his] ability to complete tasks requiring frequent interaction with general public, coworkers, or supervisors," and that he "need[ed] assist[ance] with goal planning." Tr. 161. Dr. Hennings concluded that Henson was mildly impaired in the activities of daily living, and suffered moderate to marked impairment in maintaining social functioning. Tr. 154.

Also on May 12, 2005, consulting physician Mary Ann Westfall, M.D., compiled an assessment of Henson's physical residual functional capacity. Tr. 164-171. Dr. Westfall concluded from the medical evidence available to her that Henson could occasionally lift 20 pounds and frequently lift 10 pounds, that he had no limitations in standing and walking, sitting, or pushing and pulling, that he had no postural limitations, visual limitations, or environmental

Page 9 - FINDINGS AND RECOMMENDATION

limitations, that he could not frequently reach overhead with his right arm, and that he lacked acute hearing in his right ear. Tr. 164-171.

On May 16, 2005, the Administration notified Henson that it was denying his SSI claim. Tr. 33-36, 37. Henson requested reconsideration on May 26, 2005, Tr. 31-32, and on July 11, 2005, the Administration found Henson not disabled on reconsideration, Tr. 28-30, relying in part on the recommendations of Peter Lebray, Ph.D., Tr. 158, and Martin Kehrli, M.D., Tr. 172, that the conclusions of Drs. Hennings and Westfall, respectively, should be affirmed. On July 28, 2005, Henson requested a hearing before an Administrative Law Judge, to appeal the Commissioner's adverse decision. Tr. 26.

On March 21, 2006, Henson consulted with his treating physician, David E. Oelke, M.D., for gastroesophageal reflux. Tr. 126, 181-182, 183. In March, April, and May 2006, Henson consulted on several occasions with Dr. Oelke, Alina I. Dumitrescu, M.D., and Alan L. Whitney, M.D., for left leg cellulitis and related conditions, which apparently cleared up completely by the end of May 2006. Tr. 125, 178, 179, 180, 185-186, 187-190, 192-195, 196, 197-198, 199-202.

A hearing was held on Henson's SSI claim before an ALJ on September 22, 2006. Tr. 203-221. The ALJ heard testimony from Henson, Tr. 207-215, his girlfriend, Tr. 215-218, and a vocational expert, Tr. 218-220. Henson was not represented by legal counsel at the hearing, having elected not to seek legal representation after being advised of his right to do so. Tr. 206-207.

Two months later, on November 22, 2006, the ALJ issued a decision finding that Henson was not disabled. Tr. 11-13, 14-23. Henson timely requested review of the ALJ's decision on January 26, 2007, Tr. 9-10, and on June 20, 2007, the Appeals Council declined his request, Tr.

Page 10 - FINDINGS AND RECOMMENDATION

4-6. In consequence, the ALJ's decision became the agency's final order for purposes of judicial review. *See* 20 C.F.R. § 422.210(a); *see also, e.g., Sims v. Apfel*, 530 U.S. 103, 107 (2000). This action followed.

## SUMMARY OF ALJ FINDINGS

At the first step of the five-step sequential evaluation process, the Administrative Law Judge found in his November 22, 2006, opinion that Henson did not engage in substantial gainful activity at any time following his alleged protective filing date of March 4, 2005. Tr. 16. He therefore proceeded to the second step of the analysis.

At the second step, the ALJ found that Henson's medical impairments of right rotator cuff tendonitis, major depressive disorder, and personality disorder with antisocial traits were "severe" for purposes of the Act. Tr. 16. Because the combination of impairments was deemed severe, the ALJ properly proceeded to the third step of the analysis.

At the third step, the ALJ found that none of Henson's impairments was the equivalent of any of the impairments enumerated in 20 C.F.R. § 404, subpt P, app. 1. Tr. 18. The ALJ therefore properly conducted an assessment of Henson's residual functional capacity. Specifically, the ALJ found that Henson had:

> the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently; stand and/or walk for a total of about six hours in an eight hour workday; and sit for a total of about six hours in an eight hour workday. The claimant is unable to perform work that requires acute hearing or frequent overhead reaching with his right upper extremity, and he is limited to work that involves simple, routine tasks and instructions, with no more than minimal public contact and no more than occasional contact with co-workers and supervisors.

Tr. 18. In reaching these conclusions, the ALJ considered all of the objective medical evidence in the record, as well as Henson's own statements and those of his girlfriend as to his ability to

Page 11 - FINDINGS AND RECOMMENDATION

perform the activities of daily living, the frequency and intensity of his pain and other symptoms, and the efficacy both of medical treatment and of other measures taken to alleviate his symptoms. Tr. 18-21.

At the fourth step of the five-step process, the ALJ found in light of his RFC that Henson was unable to perform his past relevant work. Tr. 21.

At the fifth step, the ALJ found in light of Henson's age, education, work experience, and RFC that there were jobs existing in significant numbers in the national and local economy that he could perform. Tr. 22. Relying in part on the testimony of an objective vocational expert, the ALJ cited as examples of light, unskilled jobs that Henson could perform, despite the limitations listed in his RFC, occupations including laundry sorter, assembler, and folding machine operator. Tr. 22. Based on the finding that Henson could perform jobs existing in significant numbers in the national economy, the ALJ concluded that he was not disabled as defined in the Act at any time following his protective filing date of March 4, 2005. Tr. 22-23.

## ANALYSIS

Henson challenges the Commissioner's finding at the third step of the sequential evaluation process, arguing that the evidence in the record supports a finding that his impairments met or equaled one of the impairments enumerated in 20 C.F.R. § 404, subpt. P, app. 1, specifically at listing 12.04 (affective disorders). Henson argues, in support of this assignment of error, that the Administrative Law Judge erred in failing to fully and fairly develop the record at the hearing of September 22, 2006.

Henson further argues that the ALJ failed to include all of Henson's limitations in his hypothetical questions to the vocational expert. On this basis, Henson argues that the

Page 12 - FINDINGS AND RECOMMENDATION

Commissioner failed at the fifth step of the sequential evaluation process to meet his burden of showing that Henson was capable of performing jobs existing in significant numbers in the national economy.

## I.   Step Three: Listed Impairments

The listed impairment covering affective disorders such as that suffered by Henson is that enumerated at 20 C.F.R. § 404, subpt. P, app. 1, 12.04. Listing 12.04 provides as follows:

*Affective Disorders*: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A.   Medically documented persistence, either continuous or intermittent, of one of the following:

   1.   Depressive syndrome characterized by at least four of the following:

      a.   Anhedonia or pervasive loss of interest in almost all activites; or

      b.   Appetite disturbance with change in weight; or

      c.   Sleep disturbance; or

      d.   Psychomotor agitation or retardation; or

      e.   Decreased energy; or

      f.   Feelings of guilt or worthlessness; or

      g.   Difficulty concentrating or thinking; or

      h.   Thoughts of suicide; or

      i.   Hallucinations, delusions, or paranoid thinking; or

2.      Manic syndrome characterized by at least three of the following:

a.      Hyperactivity; or

b.      Pressure of speech; or

c.      Flight of ideas; or

d.      Inflated self-esteem; or

e.      Decreased need for sleep; or

f.      Easy distractability; or

g.      Involvement in activities that have a high probability of painful consequences which are not recognized; or

h.      Hallucinations, delusions or paranoid thinking;

or

3.      Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B.      Resulting in at least two of the following:

1.      Marked restriction of activities of daily living; or

2.      Marked difficulties in maintaining social functioning; or

3.      Marked difficulties in maintaining concentration, persistence, or pace; or

4.      Repeated episodes of decompensation, each of extended duration;

OR

C.      Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to

Page 14 - FINDINGS AND RECOMMENDATION

do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1.    Repeated episodes of decompensation, each of extended duration; or

2.    A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3.    Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § 404, subpt. P, app. 1, 12.04. Henson appears to argue that his condition satisfies the

requirements of Listing 12.04, subparts A and B, rather than those of subpart C.[3]

The Administrative Law Judge specifically found that "the record does not show that the

claimant's mental impairments result in marked limitations in two areas of functioning as

required by the "B" criteria of listing[] 12.04 . . . nor is there evidence to satisfy the "C" criteria

of listing 12.04." Tr. 18. In support of this finding, the ALJ noted that:

> The psychological consultative evaluator, Dr. Wahl, opined that the claimant had **moderate to marked restrictions of activities of daily living**; [and] **moderate to marked difficulties in social functioning**. . . . State agency medical consultants reviewed the record in May and June 2005 and concluded that the claimant's mental impairments resulted in **mild restrictions of activities of daily living**; [and] **moderate to marked difficulties maintaining social functioning**. . . . The record as a whole establishes that the claimant's activities of daily living and general activities are somewhat diminished due to difficulty being around a lot of people and a lack of motivation and energy. However, there is evidence that he is avble to do chores when needed; play video games; read; watch television; cook simple meals; run errands; shop when needed; manage his money and pay bills; and occasionally go to a movie or dinner. He also has a friend whom he sees

---

[3] In fact, the parties affirmatively dispute whether Henson's condition satisfies the requirements of subpart B, and do not expressly address any of the other requirements of the listing.

frequently, and they visit and take walks. . . . There also is evidence that the claimant has a hard time being around people, particularly a lot of people, and avoids interacting with the public. However, the claimant indicated that he got along pretty well with supervisors, coworkers, and the public at his prior jobs, and he has a friend with whom he visits frequently. . . . **The record as a whole establishes that the claimant has mild restrictions of activities of daily living; [and] moderate difficulties with social functioning. . . .**

Tr. 19-20 (emphasis supplied).

Assuming without deciding that Henson's condition meets the requirements of subpart A(1) – the evidence in the record is consistent with, but does not mandate, the conclusion that Henson suffers from depressive syndrome characterized by ahedonia, sleep disturbance, decreased energy, and feelings of worthlessness, as those terms are used in Listing 12.04 – the question for the court is whether the ALJ properly found that his condition does not meet the requirements of subpart B. Henson asserts that he is, in fact, markedly impaired both in his activities of daily living and in maintaining social functioning, and argues that the ALJ therefore erred in so finding.

The controverted opinion of a non-treating, examining physician may only be rejected for specific, legitimate reasons. *See Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995). The ALJ here provided such reasons in support of his implicit rejection of Dr. Wahl's opinion, citing both the differing conclusions of Drs. Hennings and LeBray and evidence from the claimant's own testimony and that of his girlfriend as to the extent of his impairment in these areas. Moreover, even had the ALJ erred in rejecting Dr. Wahl's opinion, Dr. Wahl opined only that Henson was moderately to markedly impaired in each of the two areas, an impairment insufficient to meet the requirements of Listing 12.04. Any error in rejecting Dr. Wahl's opinion was therefore necessarily harmless, and harmless error cannot serve as grounds for overturning

Page 16 - FINDINGS AND RECOMMENDATION

the Commissioner's decision. *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("[a]

decision of the ALJ will not be reversed for errors that are harmless"), *citing Curry v. Sullivan*,

925 F.2d 1127, 1131 (9th Cir. 1991).

     Although no medical evidence in the record supports Henson's contention that he is

markedly impaired in his activities of daily living and in maintaining social functioning, Henson

argues that the ALJ erred in failing to develop the record more fully on this point. The ALJ's

duty to fully and fairly develop the record is "heightened" when a claimant is not represented by

counsel. *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003). Under that circumstance, "it is

incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire of, and explore

for all the relevant facts. He must be especially diligent in ensuring that favorable as well as

unfavorable facts and circumstances are elicited." *Higbee v. Sullivan*, 975 F.2d 558, 561 (9th

Cir. 1991), *quoting Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978).

     Here, the ALJ complied with his duty to fully and fairly develop the record. He

considered Henson's submissions in which he described the accident in which he was injured, his

aversion to public scrutiny, his difficulties with social functioning, and his difficulties in holding

a job, as well as the consistent reports of Drs. Nolan and Wahl. Tr. 16-21. At the hearing of

September 22, 2006, he inquired with specificity as to why Henson felt he was unable to work,

and gave him an opportunity to describe his position in his own words. Tr. 209. He further

inquired as to whether Henson was receiving counseling or taking medication in connection with

his mental illness. Tr. 209. He asked Henson about his prior employment experiences, including

his reasons for leaving each employment position, and how effectively he had been able to

perform his job duties. Tr. 210-212. He inquired as to Henson's ability to perform various

Page 17 - FINDINGS AND RECOMMENDATION

activities of daily living, including chores he was able to perform at his own residence and in his parents' house and the activities he engaged in socially with his girlfriend. Tr. 212-213. He ascertained that Henson believed he could "[p]ossibly" work full-time doing landscaping work. Tr. 214. He similarly inquired of Henson's girlfriend regarding most of these same issues. Tr. 215-218.

At the time the ALJ found that Henson was only mildly impaired in the activities of daily living and only moderately impaired in maintaining social functioning, he was in full possession of all material facts regarding Henson's impairments in these areas. His findings were supported by substantial evidence in the record, and were made according to proper legal standards. The Commissioner's decision should therefore not be disturbed on the basis of the ALJ's finding that Henson's condition did not meet or equal the listed impairments.

## II.    Step Five: Hypothetical Posed to Vocational Expert

Henson asserts that the Administrative Law Judge erred in failing to include in his hypothetical question posed to the vocational expert each of the following restrictions: marked restrictions in interacting with the general public, "a great deal of trouble in dealing with" coworkers and supervisors, questionable ability to sustain employment, and difficulty in complying with attendance requirements. Henson argues that, in the absence of vocational opinion as to the employment prospects of a hypothetical job candidate with these restrictions, the Commissioner failed to meet his burden at the fifth step of the sequential evaluation process.

The hypothetical question posed by the ALJ to the vocational expert at the hearing of September 22, 2006, was as follows:

A person of 35 years of age with a high school education, past relevant work [like that of Henson]. And assume such a person . . . would have the following

Page 18 - FINDINGS AND RECOMMENDATION

limitations of occasionally lifting 20 pounds, frequently 10 pounds, and this person would be able to stand and/or walk six hours out of an eight-hour day. There should be no frequent overhead reaching with the right upper extremity. And there should also be no work that would require acute hearing. And in addition to those limitations, this person should be limited to simple, routine tasks and instructions. There should be minimal public contact, some incidental public contact would be okay but certainly no more than minimal. And also only occasional coworker contact. And there shouldn't be any more than occasional supervisory contact. . . .

\* \* \*

Can you identify . . . jobs in the U.S. or regional economy a person with these limitations could perform?

Tr. 219.

"An ALJ must propound a hypothetical to a [vocational expert] that is based on medical assumptions supported by substantial evidence in the record that reflects all the claimant's limitations." *Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001), *citing Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995). "The hypothetical should be 'accurate, detailed, and supported by the medical record.'" *Id.*, *quoting Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999). "It is, however, proper for an ALJ to limit a hypothetical to those impairments that are supported by substantial evidence in the record." *Id.*, *citing Magallanes v. Bowen*, 881 F.2d 747, 756-57 (9th Cir. 1989).

Here, the omission from the hypothetical question of the limitations now proposed by Henson is supported by substantial evidence in the record. As discussed above, the ALJ properly rejected, for specific and legitimate reasons, Dr. Wahl's opinion that Henson was moderately to markedly impaired in social functioning, and properly concluded that Henson was only moderately impaired in that area. The hypothetical limitations regarding no more than minimal, incidental contact with the public and no more than occasional contact with coworkers or

supervisors properly reflect the ALJ's supported finding, and are moreover commensurate with Henson's own testimony as to his impairments. Although Henson submitted statements to the Administration suggesting that he suffers difficulties in finding the motivation to start assigned tasks or to face the public, Tr. 84-85, 87-94, no medical report supports the conclusion that Henson would be unable to sustain appropriate employment, or unable to comply with attendance requirements. In addition, Henson himself testified at the hearing of September 22, 2006, that he could "[p]ossibly" – that is, under at least some set of possible circumstances – maintain a full-time job performing landscaping or similar work, suggesting that he believed sustaining employment and meeting attendance requirements were within his capabilities. Tr. 214.

Because the hypothetical posed to the vocational expert did not improperly omit restrictions supported by evidence in the medical record, the Commissioner's decision should not be disturbed on the basis of the hypothetical question posed by the ALJ.

## CONCLUSION

For the reasons set forth above, I recommend that the Commissioner's final decision be affirmed. A final judgment should be prepared.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due November 13, 2008. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections

/ / /

/ / /

Page 20 - FINDINGS AND RECOMMENDATION

are filed and the review of the Findings and Recommendation will go under advisement on that

date.


Dated this 29th day of October, 2008.

Honorable Paul Papak
United States Magistrate Judge